RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 09a0387p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

FERRO CORPORATION,

             *Plaintiff-Appellant*,

      *v.*

         No. 08-3624

COOKSON GROUP, PLC, et al.,

         *Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 06-03070—Sara E. Lioi, District Judge.

Argued:  June 19, 2009

Decided and Filed:  November 6, 2009

Before:  McKEAGUE and WHITE, Circuit Judges, MARBLEY, District Judge.[*]

_____

**COUNSEL**

**ARGUED:** James B. Niehaus, FRANTZ WARD, LLP, Cleveland, Ohio, for Appellant. Roxann E. Henry, HOWREY, LLP, Washington, D.C., for Appellees. **ON BRIEF:** James B. Niehaus, Brian E. Roof, FRANTZ WARD, LLP, Cleveland, Ohio, for Appellant. Roxann E. Henry, Lisa Kimmel, HOWREY, LLP, Washington, D.C., for Appellees.

     MARBLEY, D. J., delivered the opinion of the court, in which McKEAGUE, J. joined.  WHITE, J. (pp. 12-14), delivered a separate concurring opinion.

---

    [*]The Honorable Algenon L. Marbley, United States District Judge for the Southern District of Ohio, sitting by designation.

———————————

**OPINION**

———————————

MARBLEY, District Judge.   Plaintiff-Appellant Ferro Corporation ("Ferro") appeals the decision of the district court to grant summary judgment to Defendants-Appellees Cookson Group, plc; Cookson America, Inc.; and Cookson Investments, Inc. (Cookson Group, plc; Cookson America, Inc.; and Cookson Investments, Inc., will be referred to collectively as "Cookson") and dismiss all of Plaintiff-Appellant's claims. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

**I. BACKGROUND**

**A. Synpro Asset Purchase and Agreement**

Ferro competes in the manufacture and sale of plastic additives. It has produced and sold plastic additives since at least 1990 to the present. Prior to October 1995, a Cookson affiliate, Synthetic Products Corporation ("Synpro"), also competed in the plastic additives market. In October 1995, Ferro purchased certain assets of Synpro, including its plastic additives business.  After the sale, Cookson and what was left of Synpro (now named SPC Divestitures) were and continue to be part of the same corporate family.

Under the Asset Purchase Agreement ("APA"), Synpro retained all liabilities not expressly assumed by Ferro (the "Retained Liabilities"), including any liability it might have had for actual or alleged pre-closing antitrust violations. Cookson also agreed to defend and indemnify Ferro "from and against any loss, claim, cause of action or liability, cost, or expense . . . that arise out of . . . [a]ll Retained Liabilities of [Synpro] not expressly assumed by Ferro." (Record on Appeal ("ROA") Vol. I, p. 29.) No provision of the APA stated that Cookson or Synpro would defend or indemnify Ferro for Ferro's own conduct.

**B. The Antitrust Cases**

In early 2003, Ferro and various other competitors in the plastics additives industry received grand jury subpoenas in furtherance of a Department of Justice investigation into alleged antitrust violations. In March 2003, Ferro was named as a defendant in numerous civil lawsuits alleging that various named and unnamed competitors in the plastics additives industry had violated state and federal antitrust laws from January, 1990 through January, 2003. Those cases were eventually consolidated into four cases: the Indirect Purchasers Litigation, the Direct Purchasers Litigation, the PolyOne Litigation, and the California Litigation (altogether the "Antitrust Cases"). Synpro competed in the plastic additives industry during the alleged conspiracy period until October, 1995. Synpro, however, was not specifically named in the complaints in the Antitrust Cases. There were also not any allegations in the complaints against Ferro of successor liability on behalf of Synpro. The complaints in the Antitrust Cases have been amended as recently as March 1, 2006. None of the amended complaints mentions Synpro or Cookson.

Ferro asserts that around September, 2006, during discovery in the Antitrust Cases, it became apparent that the plaintiffs had sued Ferro, at least in part, because the Antitrust plaintiffs believed that Ferro was liable for Synpro's alleged anticompetitive conduct. The APA required that notice be given to Cookson within 30 days of learning of facts or circumstances that give rise to a claim under the APA.

In September 2006, Ferro sought defense and indemnification from Cookson pursuant to the APA. On October 16, 2006, Cookson refused to defend and indemnify Ferro. Ferro then filed the current action seeking damages for Cookson's breach of its duty to defend, and further seeking a declaratory judgment requiring Cookson to defend and indemnify Ferro.

Ferro eventually settled both the Direct Purchasers Litigation and the PolyOne Litigation. The PolyOne litigation settled for $750,000. That settlement does not refer to either Synpro or Cookson. The Direct Purchasers Litigation settled for $5,500,000,

and released Ferro and Synpro. The claims against Ferro in the Indirect Purchasers Litigation and the California Litigation remain pending.

Following discovery, Ferro and Cookson filed cross-motions for summary judgment. On April 11, 2008, the district court granted Cookson's motion, denied Ferro's motion, and dismissed all of Ferro's claims. Ferro appeals.

## II. JURISDICTION

The district court had diversity jurisdiction pursuant to 28 U.S.C. §§ 1332.[1] Because Ferro has appealed from a final judgment that disposed of all of the parties' claims, we have jurisdiction under 28 U.S.C. § 1291.

## III.  STANDARD OF REVIEW

We review de novo a district court's grant of summary judgment. *Miller v. Admin. Office of the Courts*, 448 F.3d 887, 893 (6th Cir. 2006).  Summary judgment is proper if "there is no genuine issue as to any material fact [such that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  But "summary judgment will not lie if the . . . evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).   In considering a motion for summary judgment, the court must construe the evidence in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The movant therefore has the burden of establishing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388-89 (6th Cir. 1993). But the non-moving party "may not rely merely on allegations or denials in its own pleading." Fed. R. Civ. P. 56(e)(2); *see Celotex*, 477 U.S. at 324; *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994). The non-moving party must

---

[1]Ferro is an Ohio corporation with its principal place of business in Cleveland Ohio. Cookson Group, plc, is a public limited company incorporated under the laws of England with its principal place of business in London, England. Cookson America, Inc., is a Delaware corporation with its principal place of business in Providence, Rhode Island. Cookson Investments, Inc., is a Delaware corporation with its principal place of business in Wilmington, Delaware. Ferro is seeking damages in excess of $9,000,000 from Cookson.

present "significant probative evidence" to show that there is more than "some metaphysical doubt as to the material facts." *Moore v. Philip Morris Co.*, 8 F.3d 335, 339-40 (6th Cir. 1993).

The standard of review for cross-motions of summary judgment does not differ from the standard applied when a motion is filed by only one party to the litigation. *Taft Broad. Co. v. U.S.*, 929 F.2d 240, 248 (6th Cir. 1991).

> The fact that both parties have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other; summary judgment in favor of either party is not proper if disputes remain as to material facts . . . Rather, the court must evaluate each party's motion on its own merits . . . .

*Id.* (citations omitted).

## IV. LAW & ANALYSIS

Ferro filed the current action seeking damages as a result of Cookson's alleged breach of its duty to defend and indemnify, and a declaratory judgment that Cookson is obligated to defend and indemnify Ferro for any loss or liability that arises out of the Antitrust Cases resulting from conduct of Synpro, its employees, or its agents that may have occurred before October, 1995.

The APA that is the source of Ferro's claims is a contract. Construction of a contract is a question of law. *In re All Kelley & Ferraro Asbestos Cases*, 821 N.E.2d 159, 167 (Ohio 2004) (citations omitted). Thus, "[i]n construing the terms of a written contract, the primary objective is to give effect to the intent of the parties, which . . . rests in the language that they have chosen to employ." *Id.* (citations omitted). And, "[w]here the terms are clear and unambiguous, a court need not go beyond the plain language of the agreement to determine the rights and obligations of the parties." *Id.* at 168.

The APA required Cookson to defend and indemnify Ferro "from and against any loss, claim, cause of action or liability, cost, or expense . . . that arise out of . . . [a]ll Retained Liabilities of [Synpro] not expressly assumed by Ferro." (ROA Vol. I, p. 29.)

Under the plain language of the APA, the defense and indemnification provision was triggered only by the assertion of claims against Ferro based upon Synpro's "Retained Liabilities," which included any antitrust violations Synpro may have committed pre-closing.

## A. Duty to Defend

In the complaints and amended complaints in the Antitrust Cases, Synpro is not named as a defendant, successor liability is not asserted against Ferro based upon its acquisition of Synpro assets, and there are no factual allegations implicating Synpro or its employees in the alleged wrongdoing. Only Ferro was sued for antitrust violations by the Antitrust plaintiffs in the Antitrust Cases.

Ferro, however, contends that the Antitrust plaintiffs, instead of suing Synpro or Cookson, treated Ferro as including pre-APA Synpro, and sought to hold Ferro liable for antitrust violations committed by Synpro.[2] Ferro argues that even though nothing is apparent in the complaints or the amended complaints in the Antitrust Cases that implicates Synpro, the discovery that took place in those cases reveals that the claims were based, at least in part, upon conduct of Synpro. Ferro asserts that this later-learned information triggered Cookson's duties to defend and to indemnify Ferro.

The duty to defend need not arise solely from the allegations in the complaint, but may arise at a point subsequent to the filing of the complaint. *City of Willoughby Hills v. Cincinnati Ins. Co.*, 459 N.E.2d 555, 557 (Ohio 1984) (citations omitted). When there is doubt as to whether the duty to defend has been triggered by the pleadings in the

---

[2]Ferro's position appears to belie common sense. If the Antitrust plaintiffs had asserted claims against Ferro based upon Synpro's actions, Ferro had a valid and simple defense to such claims: it did not assume Synpro's Retained Liabilities, either under the express terms of the APA or under Ohio law. Under Ohio law, a buyer corporation is not liable for the seller corporation's tortious conduct unless either: (1) the buyer agrees to assume such liability; (2) the transaction is a de facto consolidation or merger; (3) the buyer is merely a continuation of the seller; or (4) the transaction is entered into fraudulently for the purpose of escaping liability. *Flaugher v. Cone Automatic Mach. Co.*, 507 N.E.2d 331, 335 (Ohio 1987). Neither party in this case has asserted that any of these exceptions could apply.

Thus, had such claims been asserted against Synpro, Ferro could have disclosed the APA to the Antitrust plaintiffs, who in turn could have sued Cookson. Ferro also could have stated as a defense in its answers to the complaints that per the APA, it did not assume Synpro's Retained Liabilities; Ferro, however, never presented this defense.

complaint, the insurer must defend.**3** *Id.* at 558. Nevertheless, the allegations in the complaint must "state a claim which is *potentially or arguably* within the policy coverage . . . ." *Id.* (emphasis added), *cited by see M/G Transp. Servs., Inc. v. Water Quality Ins. Syndicate*, 234 F.3d 974, 977 (6th Cir. 2000) (finding that "[u]nder Ohio law, whether an insurer has a duty to defend an action against an insured is initially determined by the scope of the pleadings"). If the underlying factual allegations in the complaint do not fall potentially or arguably within the policy coverage, then there is no need to look beyond the allegations in the complaint, and the duty to defend is not triggered. *Id.*, *cited by Holloway Sportswear, Inc. v. Transp. Ins. Co.*, 58 F. App'x 172, 173-74 (6th Cir. 2003); *Ohio Gov. Risk Mgmt. Plan v. Harrison*, 874 N.E.2d 1155, 1160 (Ohio 2007) (citations omitted); *see also M/G Transport*, 234 F.3d at 977 (finding that if the insurer's duty to defend is not apparent from the pleadings, the duty to defend only exists if the claim is potentially or arguably covered).

In *Motorists Mutual Insurance Co. v. National Dairy Herd Improvement Ass'n, Inc.*, 750 N.E.2d 1169 (Ohio Ct. App. 2001), the plaintiff contended that evidence developed during the course of discovery in the litigation demonstrated that the plaintiff's claims fell within the policy coverage. *Id.* at 1176. The court held, however, "[w]e will not . . . impose a duty to defend based on allegations outside the complaint, where the complaint does not state a claim that *arguably triggers coverage*." *Id.* at 1176, *cited by Holloway*, 58 F. App'x at 175 (emphasis added); *see also Harrison*, 874 N.E. 2d at 1160 (finding that the scope of the allegations in the complaint is what determines if the duty to defend has been triggered). If review of the allegations in the complaint reveals claims that potentially or arguably trigger the duty to defend, "then, and only then, does *Willoughby Hills* dictate that a court look to extraneous matters to determine whether a defense is required of the insurer." *Id.***4**

---

**3**Although these cases involve insurers rather than indemnitors, under Ohio law, "[a]n indemnitor's duty to defend under an indemnity contract is subject to the same standard as an insurer's duty to defend under an insurance contract." *Westlake Vinyls, Inc. v. Goodrich Corp.*, 518 F. Supp. 2d 918, 936 (W.D. Ky. 2007).

**4**Ferro is completely unable to distinguish *Motorists Mutual*. Ferro asserts that it conflicts with the Ohio Supreme Court's ruling in *Willoughby Hills*. We disagree. We have already favorably cited *Motorists Mutual* in *Holloway*. In *Holloway*, we recognized that *Motorists Mutual* was a correct

In this case, neither Cookson nor Synpro was named as a defendant, or even mentioned, in any of the complaints or amended complaints. There are no allegations made against Ferro in the complaints or amended complaints based on the principles of successor liability. The Antitrust plaintiffs alleged that each corporate defendant acted through its own employees or agents.

Ferro points to only two complaint allegations to support its assertion that the complaints arguably encompassed claims against Ferro for Synpro's Retained Liabilities: (1) the existence of an antitrust conspiracy that started in 1990 and lasted until 2003; and (2) that both named and unnamed co-conspirators engaged in that conspiracy. Ferro reasons that although Synpro is not specifically named in the complaints, Synpro competed in the plastics additives industry during the alleged conspiracy period until it sold its plastics additives business to Ferro in 1995.

Courts "need not stretch the allegations beyond reason to impose a duty on the insurer." *Motorists Mutual*, 750 N.E.2d at 1176. The fact that Synpro competed in the plastics additives industry during the time a conspiracy is alleged to have occurred, and the fact that the complaints recognize there may be unnamed co-conspirators, is not sufficient potentially or arguably to state a claim against Ferro arising from Synpro's Retained Liabilities for its pre-closing conduct. This construction stretches the allegations beyond reason. Bolstering our conclusion that the mere mention of "unnamed co-conspirators" is not sufficient to draw Synpro within the purview of the allegations is the fact that amended complaints have been filed in some of the Antitrust Cases, but no allegations against Synpro have ever been made.

Therefore, though a duty to defend can arise from extraneous matter outside the complaint, the complaint must still trigger the duty to defend before a court looks to extraneous matter. It is unfair to impose a duty on an insurer where the pleadings failed to notify, even arguably, that the insured is being sued on a claim covered by the policy.

---

interpretation of *Willoughby Hills*. *See* 58 F. App'x at 175.

To adopt Ferro's interpretation[5] would "effectively impose an absolute duty on the insurer to provide a defense to the insured regardless of the cause of action stated in the complaint." *See Motorists Mutual*, 750 N.E.2d at 1176, *cited by Holloway*, 58 F. App'x at 175. Because we have determined that the complaint allegations in the Antitrust Cases do not state claims that potentially or arguably fall within the purview of the APA duty to defend, we need not look at extraneous matter developed during the course of discovery.

Furthermore, the fact that Synpro was released in the settlement of the Direct Purchasers Litigation does not establish that claims had been asserted against Ferro based on Synpro's conduct. The content of a release is not necessarily evidence that, in fact, such claims were asserted, especially in light of the background surrounding the release.[6] Synpro was not released in the settlement of the PolyOne Litigation. For the settlement of the Direct Purchasers Litigation, James Bays ("Bays"), Vice President, General Counsel, and Secretary for Ferro, emailed William Gorgone ("Gorgone"), General Counsel for Cookson, regarding the draft of the settlement agreement:

> As written, the text of the settlement agreement probably would not release the Cookson group. I believe that some minor, unobtrusive modifications to the definition of "Releasees" could protect Cookson without raising an alarm on the plaintiffs' side. I am, however, reluctant to promote those modifications before we have a firm indication from you that Cookson is going to contribute in a substantial way to the resolution of this matter.

(ROA APX Vol. VI p. 2387.) Gorgone responded:

> Thank you for the documents. We will review them in due course. Note however that by entering into these agreements without Cookson being

---

[5] Ferro argues that even if the complaints failed to set forth allegations to trigger the duty to defend, "the district court was still obligated to examine matters well outside the four corners of the pleadings, to determine whether the allegations do state a claim which is potentially or arguably within policy coverage." (Brief of Plaintiff/Appellant Ferro Corporation ("Ferro Brief") p. 23) (internal citations and quotation omitted).

[6] In the statement of facts in Ferro's Brief, Ferro includes information about Rule 408 settlement discussions that is supported only by a reference to an affidavit of M. Neil Rains ("Rains"). (Ferro Brief p. 10.) Rains's affidavit, which is dated May 8, 2008 (almost one month after the district court filed its Memorandum Opinion and Order granting summary judgment for Cookson on April 11, 2008), is not part of the summary judgment record in this case.

> released to our satisfaction, we would have no incentive to make any meaningful settlement offer (assuming that we believe any participation by Cookson is prudent).

(*Id.*). Bays replied:

> Understood. If we were to settle without an agreement with you, we would simply have to pursue our claim against Cookson via the case in Judge Lioi's court.

(*Id.*)

This exchange of emails shows that Ferro and Synpro believed that a settlement agreement releasing Ferro would not operate to release Cookson for any Synpro liability. Ferro also believed it could ask the Antitrust plaintiffs to modify the settlement to include Synpro without "raising an alarm on the plaintiffs' side." In other words, Ferro believed it could secure a release for Synpro without triggering the Antitrust plaintiffs' suspicions that Synpro could be liable for any alleged wrongdoing. This suggests that Ferro did not believe the Antitrust plaintiffs were aware at the time of the Direct Purchasers Litigation settlement that Synpro could be liable. Bays's email does not state that the Antitrust plaintiffs inquired about Synpro or gave any indication they were seeking to hold Synpro liable.

We need not address the other grounds set forth by the district court to support its determination that Cookson had no duty to defend Ferro in the Antitrust Cases. Accordingly, we affirm the district court's decision to grant summary judgment in favor of Cookson on the issue of defense.

### B. Duty to Indemnify

Under Ohio law, the "duty to defend is broader than and distinct from [the] duty to indemnify." *Harrison*, 874 N.E. 2d at 1160; *see Pilkington N. Am., Inc. v. Travelers Cas. & Sur. Co.*, 861 N.E.2d 121, 127 (Ohio 2006) (finding that "[t]he duty of defense is much broader than the duty of indemnification and can be invoked even though no liability is ultimately established"). In the absence of a duty to defend, there is no obligation to indemnify. *Holloway Sportswear, Inc. v. Transportation Ins. Co.*, 177 F.

Supp. 2d 764, 772 (S.D. Ohio 2001), *aff'd Holloway*, 58 F. App'x 172. Because we conclude that Cookson owed Ferro no duty to defend any of the Antitrust Cases, Ferro's failure to establish a right to a defense is necessarily fatal to its indemnity claim. Accordingly, we affirm the district court's decision to grant summary judgment in favor of Cookson on the issue of indemnification.

## V. CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's grant of summary judgment to Cookson.

_____

**CONCURRENCE**

_____

WHITE, Circuit Judge, concurring. I concur in the affirmance. Although Ferro takes issue with the district court's application of Ohio case law, faulting the court for its seeming conclusion that the question whether Cookson had a duty to defend "must be answered solely as of the date the complaints in the Antitrust Cases were filed and solely from the language in the complaint" [Pl.'s Br. 19], Ferro has not successfully refuted the district court's core conclusion that each underlying Antitrust complaint must be examined to determine if it can reasonably be understood as asserting a claim covered by the indemnity agreement. To be sure, Ferro is correct in pressing the point that this determination must be made in light of post-complaint developments in the litigation, including the discovery upon which Ferro relies. But even in this light, only the Direct Purchaser complaint can even arguably be read to allege successor liability. And nothing that occurred in the course of litigation changes that fact or makes the other complaints reasonably susceptible of another interpretation.

The Consolidated Amended Complaint in the Direct Purchaser Antitrust class action states in paragraph 1, under the heading Nature of the Case: "This lawsuit is brought as a class action on behalf of all individuals and entities who purchased certain Plastic Additives, . . . directly from defendants or any *predecessors*, parents, subsidiaries, or affiliates thereof (collectively referred to as "Defendants") from at least as early as January 1, 1990 to January 31, 2003 (the 'Class Period')." [Emphasis added.] Antitrust plaintiffs later echoed this language in discovery requests and answers. The complaint, however, describes Ferro without reference to Synpro: "Defendant Ferro Corporation ("Ferro") is an Ohio corporation with its principal place of business at 1000 Lakeside Avenue, Cleveland, Ohio. Ferro manufactured, marketed and/or sold heat stabilizers and impact modifiers in the United State [sic] during the Class Period."

When read as a whole, the Direct Purchaser complaint, although ambiguous, can reasonably be read to include allegations of liability based on the conduct of Ferro's

"predecessor" Synpro, given the preamble's assertion that "defendants" includes "predecessors." However, I can find nothing in the record or the briefs indicating that Ferro at any time cited or relied on this language.[1] In this court, Ferro argues that the district court erred in failing to appreciate that *Willoughby Hills*[2] allows an indemnitee to use information acquired in the course of litigation to establish a duty to defend. After asserting that the "district court was still obligated to examine 'matters well outside the four corners of the pleadings,' to determine whether 'the allegations do state a claim which is potentially or arguably within the policy coverage,'" a proposition with which this panel has no quarrel, Ferro continues:

> The complaints in the Antitrust Cases allege (1) the existence of an antitrust conspiracy that started in 1990 and lasted until 2003 and (2) that both named and unnamed co-conspirators engaged in that conspiracy. Those allegations, when viewed in context with the discovery requests, discovery responses, deposition testimony, and Robert Kaplan's statement that "Ferro would have been potentially liable for any anti-competitive conduct engaged in by Synpro prior to the time Ferro acquired Synpro's Plastics Additives business," [citation to record omitted] demonstrate quite clearly that the underlying complaints state claims that are arguably or potentially within the scope of Cookson's duty to defend.

The problem with this argument is that without any allegations in the underlying complaints that can arguably be read as asserting, on any ground, Ferro's liability for Synpro's pre-acquisition conduct, or any court action in the underlying proceedings that can be understood as recognizing such a claim, the discovery requests and responses, deposition testimony, and even counsel's affidavit do not create a covered claim where

---

[1] Under the circumstance that this language, found in the "Nature of the Case" preamble in one of the four complaints, has never been referred to (as far as I have been able to discover in the record) by either party or the court, I am not prepared to urge reversal on this basis. While this may provide fodder for the argument that the district court and this court place too much reliance on the underlying Antitrust complaints, the cases are clear, as is the rationale – the asserted right to indemnity and a defense must be grounded in the plaintiffs' claims in the underlying suits. Those claims may be fleshed out or elucidated through discovery, but the claims must be at least potentially part of the underlying lawsuits. No court would permit the Antitrust plaintiffs to proceed on a successor liability theory based on the PolyOne, Indirect Purchaser or California complaints, or the Direct Purchaser complaint without the Nature of the Case language, notwithstanding any developments in discovery. Further litigation would not be required to eliminate these potential claims, but rather to add them. Thus, the plaintiffs' recovery in those cases cannot even arguably be based on Ferro's asserted liability for Synpro's conduct.

[2] *City of Willoughby Hills v. Cincinnati Ins. Co.*, 459 N.E.2d 555 (Ohio 1984).

none was even arguably made.  And, like the district court, I do not find the two allegations cited by Ferro – (1) the existence of an antitrust conspiracy that started in 1990 and lasted until 2003 and (2) that both named and unnamed co-conspirators engaged in that conspiracy – to allege Ferro's liability for Synpro's actions, even when viewed in the light of the later discovery materials.  I thus concur.